UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

NGOC PHAT TRAN, #459634, )
a/k/a QUANG HANG, )
 )
                    Petitioner, )          Case No. 1:06-cv-428
 )
v. )          Honorable Robert Holmes Bell
 )
MARY BERGHUIS, )
 )          **REPORT AND RECOMMENDATION**
                    Respondent. )
_____ )

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner was convicted of second-degree murder for the killing of Khongchiam Keopatthavong (Kong), and two counts of assault with intent to commit great bodily harm less than murder (against victims Jorge Vasquez (George) and Bounthaby Saengdara (Hut)).  The events giving rise to these charges occurred in June 2002, outside a nightclub in Grand Rapids, Michigan. Petitioner discovered that his friends Kevin Thinh Do (Tiny) and Huy Tran (Huy) had been involved in a fight with other men.  Petitioner left the club, went out into the parking lot, and got into his car with Tiny as his passenger.  Petitioner "then drove straight into a crowd of people standing outside the nightclub.  [Petitioner] struck several people, one of whom suffered a fatal head injury." *People v. Tran*, No. 250332, 2005 WL 562687, at * 1 (Mich. Ct. App. Mar. 10, 2005).

On May 1, 2003, a Kent County Circuit Court jury found petitioner guilty of one count of second-degree murder, MICH. COMP. LAWS § 750.317, and two counts of assault with intent to do great bodily harm less than murder, MICH. COMP. LAWS § 750.84.  In July 2003, petitioner was

sentenced to life imprisonment on the second-degree murder conviction and 80-to-120 months for the assault with intent to do great bodily harm less than murder convictions. After unsuccessful efforts to overturn his convictions and life sentence in the Michigan courts, petitioner brought this habeas corpus proceeding. Petitioner seeks federal habeas corpus relief on the following grounds:

I. THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING THE PROSECUTOR'S MOTION OVER DEFENSE OBJECTION, TO EXCLUDE TESTIMONIAL EVIDENCE OF A GUN(S) AT THE SCENE OF THE CRIME FOR WHICH THE PETITIONER WAS CHARGED, WITH OPEN MURDER, WHICH NOT ONLY VIOLATED PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO CONFRONT AND CROSS-EXAMINE WITNESSES TO ESTABLISH AND CORROBORATE HIS DEFENSE TO THE CHARGES, BUT ALSO DENIED PETITIONER A FAIR TRIAL, OR DEFENSE COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR WHICH THE TESTIMONIAL EVIDENCE OF A GUN(S) WAS EXCLUDED BY THE TRIAL COURT.

II. THE TRIAL COURT COMMITTED PLAIN ERROR BY DISCONTINUING A VOLUNTARY MANSLAUGHTER INSTRUCTION TO THE JURY, OVER PROSECUTORIAL OBJECTION, IN VIOLATION OF PETITIONER'S DUE PROCESS RIGHTS, OR DEFENSE COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR FAILING TO REQUEST AND/OR OBJECT TO THE COURT'S DISCONTINUATION [OF THE INSTRUCTION] WITH RESPECT TO VOLUNTARY MANSLAUGHTER.

III. PETITIONER WAS DENIED DUE PROCESS OF LAW ON HIS APPEAL OF RIGHT [AND] HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL [WHEN COUNSEL FAILED TO RAISE] MERITORIOUS AND STRONGER CLAIMS OF ERROR ON APPEAL THAT WOULD HAVE REVERSED HIS CONVICTION(S).

IV. WHERE AS A RESULT OF INEFFECTIVE ASSISTANCE OF COUNSEL, THE DEFENDANT WAS DENIED HIS ABSOLUTE RIGHT TO PRESENT A DEFENSE, WAS DENIED INSTRUCTION ON TWO OBVIOUS DEFENSES BECAUSE COUNSEL DID NOT REQUEST [THEM], AND WAS DENIED CORROBORATION OF [THOSE] DEFENSE[S], THE PETITIONER IS ENTITLED TO A NEW TRIAL.

V. THE TRIAL COUNSEL REVERSIBLY ERRED WHEN IT ALLOWED ILLEGALLY SEIZED LETTERS OF BE ADMITTED EXTENSIVELY AT

PETITIONER'S MUR[DER] TRIAL EVEN WHEN AS THE RESULT OF INEFFECTIVE ASSISTANCE OF [COUNSEL], NO OBJECTION WAS MADE WHEN THEIR USE WAS A CONSTITUTIONAL VIOLATION AND THE LETTER CLEARLY [A]FFECTED THE OUTCOME OF PETITIONER'S TRIAL.

VI.    WHEN THE PROSECUTION WAS ALLOWED TO VIOLATE AN AGREED UPON STIPULATION NOT TO ELICIT TESTIMONY OR EVIDENCE REGARDING A PRIOR INCIDENT BUT WAS ALLOWED TO CROSS EXAMINE THE PETITIONER NUMEROUS TIMES VIOLATING THE STIPULATION, THE PETITIONER IS ENTITLED TO A NEW TRIAL.

VII.    WHEN THE TRIAL COURT IMPROPERLY INSTRUCTED THE PETITIONER'S JURY THE PETITIONER WAS DEPRIVED OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR TRIAL.

VIII.    WHEN THE TRIAL COURT SENTENCED PETITIONER TO LIFE FOR SECOND DEGREE MURDER WHEN IT WAS APPARENT THE COURT IMPROPERLY USED PRIOR ALLEGED BAD ACTS OF THE PETITIONER WHICH WERE ARGUED AT SENTENCING BY BOTH THE PROSECUTOR AND DETECTIVE THE SENTENCE WAS ILLEGAL, DISPROPORTIONATE, AND AS A RESULT PETITIONER IS ENTITLED TO RE-SENTENCING.

(Am. Petition, docket # 36 and Attachment F, docket # 36-7, ID#s 266-78).  The Michigan courts

found that all grounds raised by petitioner lack merit:  grounds I-III were rejected on their merits by

the trial court judge when he denied petitioner's motion for post-conviction relief, and grounds IV-

VIII were rejected on direct appeal by the Michigan Court of Appeals.

District Judge Robert Holmes Bell has referred the matter to me for all purposes,

including the issuance of a report and recommendation under 28 U.S.C. § 636(b)(1)(B) and Rule 10

of the Rules Governing Section 2254 Cases in the District Courts.  After review of the state-court

record, I conclude petitioner has not established grounds for federal habeas corpus relief.  The

doctrine of *Stone v. Powell*, 428 U.S. 465 (1976), bars habeas corpus review of petitioner's Fourth

Amendment claims.  With regard to all other claims, petitioner has not shown that the state court

decisions rejecting the grounds raised in the petition "were contrary to, or involved an unreasonable

application of clearly established Federal law, as determined by the Supreme Court of the United States" or were  "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[s]."  28 U.S.C. § 2254(d).  I recommend that the petition be denied.

## Standard of Review

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review.  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (*per curiam*); *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (*per curiam*); *Renrico v. Lett*, 559 U.S. 766, 773 (2010).  "AEDPA requires heightened respect for state court factual and legal determinations."  *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006).  If a state court adjudicated the claim, deferential AEDPA standards must be applied.  28 U.S.C. § 2254(d); *see Premo v. Moore*, 131 S. Ct. 733, 739 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)).

AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law.  *Bell v. Cone*, 535 U.S. at 693-94.  It prohibits "using

federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012)(*per curiam*). The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011); *see Metrish v. Lancaster*, 133 S. Ct. 1781, 1786-87 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). "Section 2254(d) reflects the that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Harrington*, 131 S. Ct. at 786. Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see White v. Woodall*, 134 S. Ct. 1627 (2014); *Metrish v. Lancaster*, 133 S. Ct. at 1786-87; *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010).

## Proposed Findings of Fact

### A.    Preliminary Examination

Petitioner received a preliminary examination in the 61st Judicial District Court. (Preliminary Exam (PE), docket #s 45-47). Judge David Buter heard testimony from numerous witnesses over the course of the three-day hearing. Preliminary examination testimony shaped defense counsel's trial strategy of claiming that petitioner's action of hitting Kong, George, and Hut

with his car had been an accident. The testimony of petitioner's friend Tiny (petitioner's passenger when he hit the victims) and petitioner's girlfriend, Saruth Chu, made it very difficult, if not impossible, for petitioner to claim that he had acted in self-defense, defense of others, or before his blood had time to cool.[1]

Tiny's testimony gave no support for a claim of self-defense or defense of others. Tiny did not see anyone with a gun or a knife on the night in question. (PE, 200). Tiny had not seen anyone outside petitioner's car attempting to enter it. He did not see anyone pull out a knife or a gun while he was petitioner's passenger. (PE, 216). The victims did nothing to petitioner:

Q    Okay. I want you to do your best to tell me everything you remember Tony[2] tellin' you about what happened with the guy gettin' hit. He said he hit a guy. Does he say anything about who the guy was?

A    He didn't say who the guy was.

Q    Did he tell ya that he was mad at the guy?

A    He was mad at the guy?

Q    Yeah. Did he tell you that this was one of the guys you had -- had beat you up or anything like that?

A    Oh? The guy beat me up that's why he ran over?

Q    I'm asking you that.

A    Oh, nah. That's -- that's -- that's crazy, you know like, why would you wanna get even with somebody like to run them over. And plus tho-- those guy they -- they hit

---

[1]Tiny and Saruth were extremely reluctant witnesses. Tiny was taken into custody in Warren, Michigan on a material witness warrant and transported back to Kent County. (PE, 152, 156, 158, 221-22). Saruth had to be compelled by subpoena to come back to Michigan from California. (PE, 294-95).

[2]Petitioner used the alias of "Tony."

me, you know, they didn't do nothing to him.  Why would he want to get even with them?

* * *

Q    Did he ever tell you that the guys had threatened him or you in the car and that's why he had to run 'em over, anything like that?

A    No.  I don't remember ma'am.

(PE, 233-34).

In a similar fashion, Tiny's preliminary examination testimony made it difficult for petitioner to claim that he had acted before his blood had time to cool.  Petitioner had been mad at Tiny for making a scene inside the club and later getting beaten up outdoors, but petitioner had not taken any action against Tiny.  (PE, 245).  Petitioner's attorney was able to elicit some favorable testimony from Tiny that would lend support to a theory at trial that petitioner had been scared, that he had just been trying to get out of the club's parking lot as fast as possible, and that he did not intend to hit the pedestrians.  (PE, 261-62).

Saruth's preliminary examination testimony further undermined a self-defense theory:

Q    Does he ever tell you face to face before he gets arrested that anyone tried to hit him or hit him?

A    No.

Q    Do you see any injuries on him when you see him at Monique's?

A    No.

Q    Is his clothing torn or hurt in any way?

A    No.

* * *

Q      Did he ever say that anyone actually tried to pull him out of that vehicle?

A      No.

Q      Does he ever say someone damaged his vehicle in any way?  You know, beat up on his car or anything before this happened?

A      No.

(PE, 335).

Phoutason Chanthavixai (Kack) testified that after petitioner had plowed through the crowd and drove away, he saw a man named Nolan with a gun:

Q      At any time before Khong[3] got hit did you -- were you in possession of a weapon of any kind while you're at the bar?

A      I didn't have no weapon on me.

Q      Did you see anyone display a weapon -- take out a weapon of any kind -- gun, knife --

A      Yes, I did.

Q      Okay.  Did you see them do that before Khong was hit or after?

A      After Kong got hit.

Q      Okay.  Before he got hit did you see anyone with any weapon out?

A      No.

Q      Okay.  When did you see the weapons after?

A      After he got hit and after the car already left the parking lot and some guy ca -- came out wit' a weapon and he got mad, he went -- run back inside the club with the weapon.

Q      Do you know who that person was?

---

[3]In the preliminary examination transcript, the deceased victim's nickname is spelled "Khong," rather than "Kong."

A      Yes.

Q      Who's that person?

A      Nolan.

Q      What kind of weapon did he have?

A      He have a BB gun.  From what I find out it was a BB gun.  That he brought it out and then he fall off his hand.

Q      But when you saw it that night fair to say you didn't know if it was real or not?

A      No.  I didn't know if it was real or not.

Q      Handgun size?

A      Yeah.  Handgun size.

Q      Did you see anyone fire a weapon of any kind that night?

A      No.

Q      Did you see anyone threaten anyone with a weapon that night.

A      No.

(PE, 29-30).

None of the other witnesses saw a gun, before or after the incident.  The following

excerpt is a representative sample of the testimony received:

Q      Okay.  At any time before the car hit the people did you ever see anybody with weapons out there in that parking lot?

A.     No.

Q      Did you ever see anyone with any weapons inside the bar threatening anybody?

A      Nope.

(PE, 140; *see also* PE 199-201, 215-16, 234).

-9-

On October 29, 2002, Judge Buter bound over petitioner for trial on all charges:  open

murder[4] in the killing of Khongchiam Keopatthavong (Kong), assault with intent to murder Jorge

Vazquez (George), and assault with intent to murder Bounthaby Saengdara (Hut).  (PE, 355-60).

### B.    Circuit Court Proceedings

Petitioner's trial began on April 14, 2003.  After the jury had been selected and

outside its presence, Kent County Circuit Court Judge Dennis Leiber heard arguments on the

prosecutor's motion in limine regarding Kack's reference to seeing a BB gun after petitioner had left

the scene in his car.  Judge Leiber found that the evidence that a gun had been seen after the incident,

without more, was not relevant.  No nexus had been shown between the crimes charged and the later

observation of a gun.  "Whatever happened in a bar may or may not become relevant.  I don't have

that evidence in front of me, but I certainly don't have evidence here that something happened after

the crime [h]as any nexus to the crime itself, and so that motion is respectfully granted."  (TT II,

170).  In addition, there was a reference to guns in a police report.  The author of the report stated

that he heard from someone that there had been a big fight and that both groups were pulling out

guns and pointing them at each other.  Judge Leiber found this "to be a textbook example of

hearsay."  (TT III, 178).  The statement could not be considered under the hearsay exceptions for

excited utterance or present sense impression.  The declarant was an unknown individual.  It was not

the officer's present sense impression or excited utterance.  (TT III, 180).

---

[4]Under Michigan law, the charge of open murder allows a defendant to be convicted of
first-degree or second-degree murder or manslaughter, depending on the proofs.  MICH. COMP. LAWS
§ 767.71; *see People v. Johnson*, 398 N.W.2d 219, 222-23 (Mich. 1986); *see also Williams v. Jones*,
231 F. Supp.2d 586, 589 (E.D. Mich. 2002).

[W]e don't know who the declarant is to determine whether as an excited utterance the declarant is under the stress of excitement caused by the event or condition, and we don't know who the declarant is who was describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter.

We don't know who the person is who is attributed to having said these things and, while we -- the difference between whether the declarant is available and whether the declarant exists, we simply don't know.  I just don't see how that satisfies these additional theories or this additional information that makes that admissible in any way or to be received by the jury even if it is admissible.

(TT III, 180-81).  Judge Leiber granted the motion in limine and denied a defense motion for reconsideration made after the jury had been selected, but before jurors were sworn.  (TT II, 164-73; TT III, 177-81).

Testimony from various witnesses at trial established that on the night of June 15, 2002, a group consisting of Khongchiam Keopatthavong (Kong), Jorge Vazquez (George), Phoutason Chanthavixai (Kack), Chittakone Chanthavixai (Johnny), Anna Michelle Chanthavixai (Michelle), Laonn Lucy Nam (Lucy), Angela Deleon (Angie), and others from the Holland, Michigan area traveled to Maxim's, a nightclub in Grand Rapids.  (TT III, 251-52, 273, 290-92; TT IV, 323).  They had to park their cars in an overflow parking lot and wait in line to get into the club.  (TT III, 252-53, 291; TT IV, 323-25).

Kevin Thinh Do (Tiny) testified that he went to Maxim's on the night in question with petitioner and possibly some unidentified third man, whose name he could not remember.[5]  (TT IV, 442).  Petitioner drove to Maxim's in his white Honda CRX.  (TT IV, 443).  Inside the club, there was a verbal exchange of some sort between the members of petitioner's group and another group.  (TT III, 255; TT IV, 326, 445-46).  At about the same time, Tiny got into an argument with

---

[5]Tiny disappeared and attempted to avoid testifying at petitioner's trial.  Police found Tiny in the Detroit area.  Judge Leiber was forced to set a $10,000 cash-surety bond.  (TT III, 308-14).

his girlfriend, Dianna Bouaphekeo (Dianna).  (TT IV, 443, 446).  Tiny was kicked out of the club

for being too loud.  (TT IV, 447-48).  Huy Tran (Huy) went outside with him.  (TT VIII, 720).  A

fight broke out, and Tiny and Huy ended up getting beaten up.  (TT III, 277-78, 298, 303; TT IV,

328-30, 351-54, 441-52, 502; TT V, 574, 581, 585; TT VI 598, 607, 655-58; TT VII, 699, 721, 726;

TT VIII, 721).

       Petitioner helped Tiny walk back to his car.  (TT IV, 452-56).  Tiny testified that he

was sitting in the passenger's seat.  Tiny was the only other person in the car when petitioner hit the

victims.  Tiny denied pointing out his assailants so that petitioner could run them over with his car.

(TT V, 489-90, 497).  Tiny stated that he closed his eyes and did not open them until he heard

petitioner "hit more than one" person.  (TT IV, 456-59, 496, 504-06).  Tiny never saw anyone with

a weapon.  (TT IV, 491-92).

       Kong died as a result of the severe head trauma that he suffered.  He also sustained

crush injuries to his right arm, thigh, and knee.  (TT IX, 831, 836-42, 855-56).  The surviving

members of Kong's group described what they saw and heard.  The women were in the front of the

group, with the men following behind them as they were returning to their cars.  (TT III, 304; TT VI,

608).  Lucy saw petitioner's car hit Kong.  (TT III, 296).  The car did not slow at any time before

hitting him.  Kong went flying through the air and landed on the pavement.  Lucy did not see anyone

go up to the car, try to get the driver out, or try to damage his car.  (TT III, 297-300).  Angie saw the

white car coming on fast and heard its engine.  She saw it hit Kong first, and then George.  (TT VI,

599-603).  Johnny related that he heard the car's engine and the sound of its tires.  He saw the white

car coming towards him and jumped out of the way.  The car hit him and knocked off one of his

shoes.  (TT V, 575-76).  Johnny testified that the car kept going and the driver appeared to be trying

to hit more people rather than avoid them.  (TT V, 576-77).  Kack heard the car's engine.  (TT III, 267-68, 280, 286-87).  He saw a white, two-door, Honda CRX with its headlights off swerve towards him, but he jumped out of the way.  (TT III, 261-64).  As Kack was getting back to his feet, he saw the car swerve in an attempt to hit his little brother Johnny.  (TT III, 263-64).  Kack did not see Kong get hit, but heard the impact.  (TT III, 262).  George testified that he heard the car's engine and its tires squeal.  (TT IV, 332, 363).  He saw the car coming, but was unable to avoid getting hit.  (TT IV, 333, 349, 357).  The car clipped both of George's legs and he was knocked to the ground.  (TT IV, 322-34).  George sustained injuries to his legs, chest, and arm.  (TT III, 266, 283; TT IV, 333-40).

Bounthaby Saengdara (Hut) testified that he was at Maxim's on the night in question with his friends Chad, Sniper, and Hui.  (TT V, 540).  Hut testified that there was an initial argument indoors, followed by a fight outdoors.  (TT V, 544).  Hut stated that he "laid out" one of the combatants by hitting him in the head with a bottle.  (TT V, 558).  Later, Hut was part of a group of people walking back to their cars.  Hut heard petitioner's car engine roar and saw it pick up speed and swerve towards him.  Hut was hit in the right leg.  (TT V, 546-47, 559).  Hut testified that his companions took him to the hospital in Holland, Michigan, where he was treated and released.  (TT V, 548-49, 560; TT IX, 808-12).

Anthony Rantz, a witness not associated with any of the aforementioned groups, gave the following description of that he saw and heard:

Q       What did you see happen next?

A       When I had backed down from in back of the truck I was standing just behind it next to some cars.  I heard a car behind me, which is not unusual in the parking lot, but what I did hear was screeching tires of a car, and I saw it heading over towards the

group of people that were walking towards the overflow lot in the back there on the side of the MAC.

And what I didn't expect was that this car without its lights on went straight towards this group of people that were walking away, and without slowing down or any sign of breaking at all, kept going as fast as they could all the way until they got up to the people, and I think actually went closer to the curb to try to get as many as possible.

Q    Is that how it appeared to you?

A    That's what it appeared to be from my perspective, and the sound that I won't forg[e]t for a long time is the sound of people hitting the car.

* * *

Q    Before the people are hit, did you see anyone try to rush the vehicle, before he hit the people.

A    If anything, they only had time to react.  They didn't have time to make advances toward the vehicle at all.  Most of them had their backs toward the vehicle at that time.  I don't think they were expecting it.

(TT V, 534).

Mr. Rantz testified that petitioner's car swerved to hit as many people as possible:

Q    When you saw this car coming [at] all these people, did you see any sign that the car slowed in any way?

A    No, none at all.

Q    When you saw this car going at these people -- I think you testified earlier that it went directly toward the people.

A    Yes.

Q    Wasn't it just going down the lane?  Why do you say that?

A    When the people got closer, the car swerved as close as it could to the curb to get as many people as it could.

Q    Was it your impression that the car tried at any time to avoid hitting these people?

A    No.

-14-

(TT V, 517-18). Rantz never saw anyone with a gun or a knife. (TT V, 523). Mr. Rantz estimated

that the car was going about 35 miles per hour when it started hitting people. (TT V, 519-20). Rantz

described the vehicle as a white, later edition, Honda CRX. (TT V, 518). Expert witness testimony

established that the car never slowed before hitting the victims. (TT VIII, 776-801).

Mr. Rantz testified that the driver did slow down *after* hitting the victims, and he did

not appear to be in a rush to leave the area:

Q      Did you see the car leave the lot after he hit people?

A      Yes, he came around on the right side of the parking lot and came back around, not
       really going super fast but kind of leisurely trying to find his way out, trying to get
       out, and once he found his way, he was out of the parking lot and down the road.

(TT V, 520). Mr. Rantz called 911. Rantz's girlfriend had some medical training, so she and Rantz

attempted to do what they could to help the victims until medical assistance arrived. (TT V, 520).

Rantz later gave the police a description of the vehicle and what he had witnessed. (TT V, 522).

Petitioner's girlfriend, Saruth, testified that she met petitioner in Maryland. She

moved to the Grand Rapids area a short time after petitioner moved here. They lived in Wyoming,

Michigan at the residence of Thuy Tham (Thuy) and his wife Hoa Tham (Monique). Tiny and his

girlfriend Dianna also lived at the Tham residence. (TT IV, 368-75, 438-39; TT VI, 649-50).

Saruth knew that petitioner owned a white, two-door, Honda CRX. (TT IV, 370-71).

Saruth came to Maxim's on the night in question with others. She had not been petitioner's

passenger. Saruth saw petitioner at Maxim's. (TT IV, 371). She never saw anyone touch petitioner.

(TT IV, 406). According to Saruth, at some point three Asian men approached the table where

petitioner, Saruth and their other friends were seated. One of the three asked whether petitioner and

his friends were the Vietnamese guys that beat up his friend. At about the same time, Tiny and his

-15-

girlfriend Dianna had a loud argument.  Tiny was screaming.  The bouncers kicked him out of the nightclub.  (TT IV, 378-80, 425-26).

Dianna testified that petitioner called her over to the area where he was sitting and threatened to "do something" to her if she "ever got loud with Tiny again," because Tiny was his boy.  (TT VIII, 741-42).  Dianna denied telling the police that petitioner had threatened to slit her throat.[6]  (TT VIII, 741).  Dianna testified that petitioner's threat to slit someone's throat had been directed to her friend Jessica, not her.  Petitioner was "hitting on" Jessica.  She yelled at him and tried to get away.  He called her a stupid bitch and threatened to slit her throat.  (TT VIII, 741).

While Tiny and Huy were outside Maxim's they became involved in a fight and they were on the losing side.  (TT IV, 380-83; TT VI, 654-56; TT VIII, 689, 721).  Petitioner was not involved in the fight.  (TT II, 278; TT IV, 434; TT VIII, 689).

Saruth left the nightclub with Monique.  (TT IV, 388).  Within ten-to-fifteen minutes after Saruth's return to the Tham residence, petitioner arrived in his Honda.  Petitioner had no visible injuries, but his car had sustained significant damage to the windshield on the passenger's side.  (TT IV, 392; TT VII, 684).  Saruth overheard petitioner talking to others outside the house in Vietnamese.  Petitioner came inside and told Saruth to pack her bags because they were going to Jackson, Michigan.  (TT IV, 391).  Tiny testified that it had been petitioner's idea to leave town that night.  (TT IV, 442).  Petitioner contacted Dianna by telephone.  He told her not to say anything and go back to Iowa.  (TT VIII, 745-46).  Dianna testified that Tiny admitted that he had pointed out the men and then petitioner ran over them.  (TT VII, 750).

---

[6]Dianna testified that she had not volunteered to provide testimony at petitioner's trial.  She had to be served with a subpoena.  (TT VIII, 743).

Petitioner, Tiny, and Saruth took off for Jackson, Michigan.  (TT IV, 390-392). Petitioner was the driver, Saruth was in the front passenger's seat, and Tiny was in the back seat. (TT IV, 393-94; TT V, 473).  The passenger's half of the windshield was smashed.  (TT IV, 393). Saruth asked petitioner what had happened and he responded that he hit people.  (TT IV, 393, 428). Saruth testified that there was broken glass inside the car and a large hole in the windshield.  She sat on a blanket to protect her from the broken glass.  She used her feet to hold up a large piece of glass that they had obtained at the Tham residence.  The glass covered up the hole and kept the wind from coming inside.  (TT IV, 394, 401-02).  In Jackson, they stayed at petitioner's friend's house.  (TT IV, 395).  Petitioner and Saruth planned to stay in Jackson for a few days, then move to another state. (TT IV, 395-96).

In Jackson, Tiny separated from petitioner and Saruth.  Petitioner drove Tiny to the train station and Tiny took a train from Jackson to Chicago.  Although Tiny knew that petitioner hit people with his car, he made no effort to contact the police.  (TT V, 472-75, 480-81).  Police eventually found Tiny in Warren, Michigan.  He was arrested as a material witness and he was eventually brought back to Grand Rapids to testify.  (TT V, 480-82).  The story Tiny initially gave to the police was that he did not know that anyone had been hit by a car and did not know that petitioner did it.  (TT V, 484).  At trial, Tiny denied identifying the other men involved in the fight so that petitioner could then run them down with his car.  (TT V, 489-90).

Thuy Tham testified that police found some of the items petitioner had left behind in his home.  They also checked the caller ID numbers on Thuy's telephone.  (TT VIII, 708). Through the caller ID, police found the telephone number of petitioner's ex-wife or girlfriend in Maryland, and from her phone records they found the telephone calls placed to her from Jackson,

Michigan.  (TT VIII, 763).  Police in Jackson were informed that they should be looking for a white,

Honda CRX with damage to the front end, and possibly Maryland license plates.  (TT VII, 763).

Police officers in Jackson located petitioner's car and called for backup.  (TT VIII,

764).  Petitioner was apprehended in the early morning hours of June 20, 2002.  (TT IV, 397-99).

Saruth's attempt to deceive the police by referring to petitioner as "Quang," rather than by his alias

of "Tony," proved unsuccessful.  (TT IV, 398; TT VIII 766-68).

Police recovered petitioner's Honda.  The windshield on the passenger's side was

smashed.  The windshield and license plate tested positive for blood.  (TT VI, 632, 636).  The car

had sanding marks on the hood.  (TT VIII, 768).  Petitioner and others had been attempting to "fix"

the car by altering its appearance. (TT IV, 396-97).  Police determined that the car's "brakes worked

fantastic and it accelerated fine."  (TT VIII, 791).  The Honda was able to hit a speed of up to 35

miles per hour in the limited space between its starting point and the location where the pedestrians

had been hit.  The car covered the distance in a little under six seconds.  At 35 miles per hour, the

car was nearing the end of the range for first gear.  It would have been producing significant RPMs

and would be as loud as the car's engine could be.  (TT VIII, 795-98).

Petitioner and Saruth exchanged correspondence while petitioner was being held in

jail.  (TT IV, 408, 416-17).  In one of his letters, petitioner indicated that Saruth's preliminary

examination testimony that petitioner had been angry on the night in question hurt his case.  (TT IV,

417).  At trial, when the assistant prosecutor asked Saruth about petitioner's mood before the

incident, her response was, "I don't remember."  (TT IV, 414).  By contrast, Saruth had no difficulty

recalling that petitioner was "scared" and "[s]omewhat panicked" when he arrived at the Tham

residence, shortly  before their flight from Kent County.  (TT IV, 429-30).

-18-

Petitioner began his testimony by emphasizing that he was the father of two children in Maryland, ages six and three.  He testified that his reasons for coming to Michigan had been purely economic:

> Q    Okay.  I'm going to want to ask you about the evening of June 16, 2002, but what I want to do is start out with the events that led up to that evening first.  For example, what got you to Grand Rapids, and just, to the best of your recollection, the sequence of events that brought you here?
>
> A    I was living in Maryland, and I kind of lost my job, and I was running out of money, and find out that my baby mother maxed out all my credit cards because of her spending habit, and I couldn't really find a job in Virginia or DC or Maryland area, so I tried coming up to Jackson first, but they said they weren't really need workers, so I try to go to Grand Rapids, Michigan, and finally asked a friend and found a job.

(TT IX, 860-61).

Petitioner admitted that he had been at Maxim's on the night in question and that he drove his car at a high rate of speed through a large group of pedestrians.  (TT IX, 863-64). Petitioner testified that when he went out on a balcony at Maxim's, he saw Tiny and Huy below on the ground.  (TT IX, 868).  Petitioner left the club and assisted Tiny into the passenger seat of his car.  (TT IX, 869-70).  Petitioner testified that he sat in the driver's seat, started the car's engine, and turned on the headlights.  (TT IX, 870).  He testified that he "got kind of panicked" and hit someone's car when he went into reverse.  (TT IX, 871).  Petitioner stated that once he had turned the car around,  he "just stepped on the gas and took off" and tried to find his way out of the parking lot.  (TT IX, 870).  Petitioner testified that he saw one man, out of a group of six or seven Laotian men coming after him, point a silver object towards him.  He stated that he "wasn't sitting around to find out if it was a gun or not."  (TT IX, 871-72, 881).  Petitioner stepped on the accelerator and just drove through the group with his car.  He saw one of the men crash into his windshield and fall

-19-

over.  (TT IX, 875).  The reasons that petitioner gave for not telling a detective about seeing someone with a gun were as follows:  "He never really asked me, and I don't remember."  (TT IX, 875).

Petitioner testified that he knew that he hit somebody and did not want to go to jail. He testified that he told Saruth and Tiny to pack up their things.  He described how he and his friends improvised a wind block which allowed him to drive his damaged Honda to Jackson.  (TT IX, 879). Petitioner's direct examination testimony concluded with his statement:  "I know I did something wrong and I'm sorry for it.  I didn't mean for anybody to get hurt."  (TT IX, 884).

Cross-examination focused on the above-referenced remorse as stemming from petitioner's being identified, apprehended, and forced to come back to Kent County and face the open murder and other felony charges.  (TT IX 885).  The assistant prosecutor's questioning highlighted petitioner's unusual choice to drive towards someone holding a silver object that "looked like a gun" rather than driving off in the opposite direction. (TT IX, 886-87).  Petitioner testified that he had stopped and then decided to drive his Honda through the group at a high rate of speed.  (TT IX, 889-91).  Petitioner admitted his lack of candor to his hosts in Jackson.  He gave them two stories about what had happened to his car's windshield.  The initial story was that he had hit a deer. When that story was greeted with skepticism, the alternative version was that someone hit his car with a baseball bat.  Neither story featured anyone holding an object that petitioner believed to be a gun.  (TT IX, 880, 892-93).

Petitioner elected to give a statement to the police after his arrest.  Initially he denied knowing anything about the incident.  Later, he admitted that he was there but stated that Tiny was the driver.  At trial, petitioner admitted that this statement was a lie.  (TT X, 947).  When the police informed petitioner that they knew Tiny was not the driver, his story shifted to statements that he had

-20-

been scared, but he said nothing about a gun.  (TT X, 947).  Petitioner never mentioned that anyone pulled a weapon on him.  No previous description of events matched his direct examination testimony:

> Q   But you never did mention anything about anybody pulling any kind of weapon on you, correct?
>
> A   Yeah, I never mentioned it.
>
> Q   And you never mentioned at the interview that anyone kicked your car, touched your car in any way, correct?
>
> A   Yeah, I think I don't remember telling him that either.
>
> Q   Because what I understand, from what you just testified to for your lawyer, didn't you say you remember a boom and somebody kicking or touching the back or your car?
>
> A   Yes.
>
> Q   You remember that?
>
> A   I remember that.
>
> Q   But you never told anyone that until today, is that correct?
>
> A   Because I never talked to anybody really about what exactly happened.
>
> Q   You never had a chance to talk on the phone or write a letter and explain to your friends and family what had happened?
>
> A   We told them some of what happened, but I couldn't really talk about everything.

(TT IX, 901).

A portion of the assistant prosecutor's cross-examination was based on petitioner's communications with others from jail.  Petitioner conceded that the description of events found in his letter to the mother of his children in Maryland made no mention of anyone having a gun or anyone touching his car.  (TT IX, 902-03).  His letter to a friend, John Nguyn, used a code name for

Tiny.  (TT IX, 911).  Petitioner asked Nguyn to keep an eye on Tiny's whereabouts and keep him

out of jail.  Petitioner did not want the police to find Tiny and did not want Tiny to come back to

Kent County and testify.  (TT IX, 911-12, 945).  Petitioner was confronted with a transcript of his

telephone call from jail to Monique in which he instructed her to persuade witnesses to disappear

so that they could not testify against him at trial and that he was willing to pay money to keep

witnesses away.  Petitioner's response was:  "If it says like that, I guess so.  I don't remember."  (TT

X, 942-43).

Petitioner conceded on cross-examination that his testimony that he came to Michigan

"just for work" was not truthful.  He came to Michigan because he was running away from trouble

in another state.  (TT X, 939).  During an early phase of cross-examination, petitioner reiterated his

economic motive for coming to Michigan, but added that he was having difficulties with the mother

of his children and was trying to get away from her:

> Q      Yeah, I think you said that initially on questioning by your attorney.  You went to
> great length about the only reason you came here is because you were looking for
> work, correct?
>
> A      Yeah.  Pretty much work.
>
> Q      Pretty much?
>
> A      Yeah, my problem with my baby mother, and it's to get away from her for a while
> because we were having problems, too.

(TT IX, 897).  Petitioner clarified that Saruth was not his "baby mother."  (TT IX, 898).  He denied

that he left the Maryland area because he was in trouble:

> Q      Did you move to Virginia before you came here?
>
> A      This confused a lot of people.  DC, Virginia, Maryland, it's very connected.  It's like
> Kent County, Wyoming, and Grand Rapids.  It's different country, but one step

-22-

you're there, one step you're there.  It's not like you have to drive two, three hours to this state.  It's right around the corner.  It's considered one area.

Q      Did you move to Iowa for a short period before you came here?

A      Yeah, I went to Iowa before.  Yes.

Q      Right before you came to Grand Rapids?

A      Yes.

Q      The truth is that you were trying to flee the Maryland area because you were in trouble, correct?

MR. MCDONAGH: Objection, Your Honor.  There's a total lack of foundation.

MS. KONCKI:  No.  There is --

THE COURT: The witness is able to answer the question.  The jury can accord whatever weight or importance they choose to the answer.  Objection's overruled.

BY MS. KONCKI:

Q      Isn't it true, sir, that the reason you left Maryland and headed up here is because you were fleeing that area because you were in trouble?

A      No.

Q      That's not true?

A      I wasn't in trouble.

Q      Are you sure about that?

A      Uh-huh.

(TT IX, 898-99).

Outside the presence of the jury, Judge Leiber heard argument related to the extent of cross-examination that would be permitted and how it related to the stipulation made by the attorneys before any witnesses had been called.  The stipulation was that the assistant prosecutor

-23-

would not be introducing evidence regarding an incident where petitioner had "attempted to cut off a man's head" in Virginia "and instead chopped off his hand," one month before the events in Michigan giving rise to the criminal charges against petitioner.

> MS. KONCKI:       Your Honor, the parties have agreed that we will not elicit testimony or evidence regarding a prior incident involving the defendant where he attempted to chop off a man's head and instead chopped his hand off. I think that was included. I told him we would agree not to pursue that. In the event it becomes relevant, we would address it in the Court outside the hearing of the jury.
>
> THE COURT:        This incident is the incident in Virginia?
>
> MS. KONCKI:       It is Judge.
>
> THE COURT:        I see. All right. Agreed?
>
> Mr. MCDONAGH:     It's agreed, Your Honor.

(TT II, 162). The cross-examination issue was resolved by an agreement that the assistant prosecutor would not ask questions regarding the specific "trouble" petitioner faced arising out of his conduct in Virginia:

> MR. MCDONAGH:     Well, your honor, as long as there's no reference to any of this -- any of the allegations that have been referred to.
>
> THE COURT:        Well, I think the reference that Ms. Koncki mentioned was trouble, that he was leaving because of trouble he had, not for employment opportunities. That's what I understood Ms. Koncki to try to explore.
>
> MS. KONCKI:       That's correct, it is, Your Honor.
>
>                        * * *
>
> THE COURT:        . . . We now know that she doesn't intend to indicate what the trouble is. Is that -- does that resolve the conflict?
>
> MS. KONCKI:       I believe it does, Your Honor.
>
> THE COURT:        I'm asking Mr. McDonagh.

-24-

> MR. MCDONAGH:   Yes, Your Honor, we're able to agree to the extent to which she's going to be questioning him on this issue before she gets into this area.

(TT IX, 931-32).  Petitioner's jury learned nothing about the nature of his out-of-state trouble from the assistant prosecutor's brief cross-examination:

> Q       . . .  Yesterday, when we stopped, I asked you isn't it true that you didn't just come here for work.  Do you remember that question?
>
> A       Yes.
>
> Q       The truth is that you didn't just come here for work; you came here from a completely different state because you were running away from trouble there, correct?
>
> A       Yes.

(TT X, 939).

After the close of proofs and closing arguments, Judge Leiber delivered the jury instructions, including petitioner's defense of accident.  (TT X, 1018-19).  The parties stipulated to instructions on involuntary manslaughter as a lesser included offense of the open murder charge. (TT X, 1033).  The attorneys interrupted Judge Leiber during the instructions and brought to his attention that he had started to read an instruction on voluntary manslaughter rather than involuntary manslaughter.  (TT X, 1020).  The matter was quickly corrected.  (TT X, 1020-22).  There was no objection to the court's instruction on involuntary manslaughter as delivered.  (TT X, 1034).

On May 1, 2003, the jury returned a verdict finding petitioner guilty of second-degree murder in the killing of Kong, assault with intent to do great bodily harm less than murder in hitting George, and assault with intent to do great bodily harm less than murder in hitting Hut.  (TT X, 1041-44).

-25-

On July 17, 2003, Judge Leiber conducted a sentencing hearing. (Sentencing Transcript (ST), found in Michigan Court of Appeals Record, docket # 58). Judge Leiber left no doubt that the sentence he was imposing was based on petitioner's conduct in this case, not on any criminal charges he may have faced elsewhere:

> Let me make perfectly clear. You are being sentenced for the crime that you committed and for which the jury convicted you on May 1st. Your are presumed innocent with regard to any and every other offense in any and every other jurisdiction.

(ST, 16). "You intentionally chose to drive your car at a high rate of speed into a crowd of people without care or concern who you hurt[.]" (ST, 17). Judge Leiber sentenced petitioner to life imprisonment on his second-degree murder conviction and 80-to-120 months on his assault with intent to do great bodily harm less than murder convictions. (ST, 18-19; Judgment of Sentence Commitment to Department of Corrections, found in Michigan Court of Appeals Record, docket # 58).

### C.    Appellate Proceedings

Petitioner appealed as of right to the Michigan Court of Appeals. On appeal, petitioner was represented by Attorney Helen Nieuwenhuis. Appellate counsel raised the following issues:

> I.    WHEN AS A RESULT OF INEFFECTIVE ASSISTANCE OF COUNSEL, THE DEFENDANT WAS DENIED HIS ABSOLUTE RIGHT TO PRESENT A DEFENSE, WAS DENIED INSTRUCTION ON TWO OBVIOUS DEFENSES BECAUSE DEFENSE COUNSEL DID NOT REQUEST [THEM], AND WAS DENIED CORROBORATION OF [THOSE] DEFENSE[S], THE DEFENDANT IS ENTITLED TO A NEW TRIAL.
>
> II.   THE TRIAL COURT REVERSIBLY ERRED WHEN IT ALLOWED ILLEGALLY SEIZED LETTERS TO BE ADMITTED EXTENSIVELY AT DEFENDANT'S MURDER TRIAL EVEN WHEN AS A RESULT OF THE INEFFECTIVE ASSISTANCE OF COUNSEL, NO OBJECTION WAS MADE WHEN THEIR USE

WAS A CONSTITUTIONAL VIOLATION AND THE LETTERS CLEARLY [A]FFECTED THE OUTCOME OF DEFENDANT'S TRIAL.

III.     WHEN THE PROSECUTOR WAS ALLOWED TO VIOLATE AN AGREED UPON STIPULATION NOT TO ELICIT TESTIMONY OR EVIDENCE REGARDING A PRIOR INCIDENT BUT WAS ALLOWED TO CROSS-EXAMINE THE DEFENDANT NUMEROUS TIMES VIOLATING THE STIPULATION, THE DEFENDANT IS ENTITLED TO A NEW TRIAL.

IV.     WHEN THE TRIAL JUDGE IMPROPERLY INSTRUCTED DEFENDANT'S JURY, THE DEFENDANT WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

V.     WHEN THE TRIAL COURT SENTENCED THE DEFENDANT TO LIFE FOR SECOND DEGREE MURDER WHEN IT WAS APPARENT THAT THE COURT IMPROPERLY USED PRIOR ALLEGED BAD ACTS OF THE DEFENDANT WHICH WERE ARGUED AT SENTENCING BY BOTH THE PROSECUTOR AND THE DETECTIVE AND WHEN THE SENTENCE WAS DISPROPORTIONATE, AND AS A RESULT DEFENDANT IS ENTITLED TO RE-SENTENCING.

(Defendant-Appellant's Brief at i, found in Michigan Court of Appeals Record, docket # 58).

The Court of Appeals rejected all petitioner's claims of ineffective assistance of counsel. It decided petitioner's claims on the merits and applied the federal standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). Petitioner had not been denied his right to present a defense. The strategy his attorney had followed was the "strongest" of the available defenses. It helped petitioner avoid a first-degree murder conviction and its accompanying non-parolable life sentence:

> Defendant's trial counsel elected to present a defense based on the theory that defendant struck the victims unintentionally as the result of his panicky flight from a potentially dangerous situation. The decision not to present a specific defense, in and of itself, does not constitute ineffective assistance, *see, e.g., People v LaVearn*, 448 Mich 207; 528 NW2d 721 (1995); *People v Lloyd*, 459 Mich 433; 590 NW2d 738 (1999), nor does presenting one defense instead of another possible defense, in and of itself, constitute ineffective assistance. *LaVearn, supra*. The defenses defendant now claims should have been presented are not well supported by the evidence presented in the record, and his trial counsel cannot be faulted for choosing the strongest of the several defenses. *Id.* at 216. Furthermore, although

-27-

defendant correctly notes that he could have presented inconsistent defenses, *see People v Lemons*, 454 Mich 234, 245; 562 NW2d 447 (1997), defendant has failed to overcome the strong presumption that his trial counsel's decision to present the accident defense alone was nothing more than sound trial strategy. This Court will not "substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Garza*, 246 Mich App 251, 255; 631 NW2d 764 (2001).

(Op., 2).

The Michigan Court of Appeals held that petitioner's claim that correspondence the assistant prosecutor used in cross-examination had been illegally seized in violation of his Fourth Amendment rights lacked merit:

The United States Supreme Court has ruled that an incarcerated person has no reasonable expectation of privacy in his prison cell. *Hudson v Palmer*, 468 US 517; 104 S Ct 3194; 82 L Ed2d 393 (1984). Even if an incarcerated person did have such an expectation, the law permits jail authorities to open a prisoner's mail for reasons of internal security. *People v Paul Williams*, 118 Mich App 117, 121; 325 NW2d 4 (1982). Although defendant correctly observes that the prosecution never established that opening the letters was necessary for jail security, the rule does not require such a specific showing. *Id.* at 121. Consequently, there was no plain error. Likewise, given that the letters were not seized in violation of defendant's Fourth Amendment rights, defense counsel could not be ineffective for failing to advocate for their exclusion. *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003).

(Op., 2).

The Court of Appeals wasted little time disposing of petitioner's argument that the assistant prosecutor had violated the stipulation. Further, it found that her cross-examination questions constituted proper impeachment:

Defendant next argues that the prosecution violated a stipulation between the parties by eliciting testimony concerning a prior bad act. Defense counsel waived the issue for appellate review by stating on the record, after his initial objection, that his objection had been met. *People v Carter*, 462 Mich 206, 215-218, 219-220; 612 NW2d 144 (2000). Because defendant waived, rather than forfeited the issue, there is no error to review. *Id.* at 219-220.

To the extent that defendant is appealing the admission of the evidence on the grounds that it was not relevant, he failed to object to its admission on the same ground he has asserted on appeal. *Weiss v Weiss*, 224 Mich App 37, 39; 568 NW2d 336 (1997); MRE 103(a)(1).

-28-

As a result, the claim of error was not preserved and we will review it for plain error affecting substantial rights. *Carines*, *supra* at 763. At trial defendant testified that he left Virginia to find work. On cross-examination plaintiff elicited an admission from defendant that he in fact left Virginia because he was in trouble. Thus the testimony was relevant as impeachment evidence.

(Op., 3).

The Court of Appeals found no merit in petitioner's claim that he had been deprived of a fair trial because his jury did not receive an instruction defining gross negligence. Further, any error had been harmless because the evidence "overwhelmingly" showed that petitioner intentionally drove his car into a crowd of people:

Defendant next argues that the trial court erred when it failed to give an instruction on gross negligence as part of its instruction on involuntary manslaughter. Defendant failed to object to the failure to instruct on gross negligence and, as a result, has forfeited the issue for appellate review. *Carines*, *supra* at 763. The omission of an instruction on gross negligence did not constitute plain error affecting substantial rights because the evidence overwhelmingly showed that defendant deliberately drove his vehicle into a crowd of people.

(Op., 3).

The Michigan Court of Appeals found no error in any aspect of petitioner's life sentence. It rejected petitioner's Sixth Amendment argument based on *Blakely v. Washington*, 542 U.S. 296 (2004). Relying on a then-recent decision of the Michigan Supreme Court,[7] the Court of Appeals found that *Blakely* did not affect Michigan's indeterminate sentencing system, because any fact-finding by the trial judge affected only the minimum, not the maximum, sentence. (Op., 3). The Court of Appeals rejected petitioner's argument that the trial court had erred in imposing a life sentence: "Defendant's life sentence falls within the guidelines' range. When the trial court's sentence is within the appropriate guidelines range, 'the Court of Appeals must affirm the sentence

---

[7]*People v. Claypool*, 684 N.W.2d 278, 286 n.14 (Mich. 2004).

unless the trial court erred in scoring the guidelines or relied on inaccurate information in determining the defendant's sentence.' *People v Babcock*, 469 Mich 247, 261; 666 NW2d 231 (2003).  The standard of proportionality does not come into play unless the sentence departs from the sentencing guidelines.  *Id.* at 262."  (Op., 3).  The appellate court therefore affirmed both the convictions and life sentence imposed on the second-degree murder conviction.

Petitioner sought review of the above-referenced issues in Michigan's highest court. On February 27, 2006, the Michigan Supreme Court denied petitioner's application for discretionary review.  (2/27/06 Order, found in Michigan Supreme Court record, docket # 59).

### D.      Stay and Abeyance

On June 20, 2006, petitioner filed his petition for federal habeas corpus relief.  His initial petition raised the grounds that the Michigan Court of Appeals had rejected on direct appeal. (docket # 1).  Petitioner filed a motion requesting a stay of his habeas petition to allow him an opportunity to return to state court and present a number of unexhausted claims to Michigan's courts. (docket # 24).  On November 28, 2006, the court granted petitioner's motion, stayed consideration of this matter, and administratively closed the case until such time as petitioner returned to this court and filed a motion to amend his petition.  (docket # 30).

### E.      Post-conviction Proceedings

In December 2006, petitioner filed a motion in the trial court seeking relief from judgment under Rule 6.500 of the Michigan Court Rules.  On April 17, 2007, he filed an amended motion for relief from judgment.  Petitioner sought post-judgment relief on the following grounds:

I.      THE TRIAL COURT JUDGE ABUSED ITS [sic] DISCRETION BY GRANTING THE PROSECUTOR'S, MOTION OVER DEFENSE OBJECTION, TO EXCLUDE

TESTIMONIAL EVIDENCE OF A GUN(S) AT THE SCENE OF THE CRIME FOR WHICH DEFENDANT WAS CHARGED WITH OPEN MURDER, WHICH NOT ONLY VIOLATED PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO CONFRONT AND CROSS-EXAMINE WITNESSES TO ESTABLISH AND CORROBORATE HIS DEFENSE TO THE CHARGES, BUT ALSO DENIED PETITIONER A FAIR TRIAL, OR DEFENSE COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT WHICH RESULTED IN TESTIMONIAL EVIDENCE OF A GUN(S) BEING EXCLUDED BY THE TRIAL COURT.

II.    THE TRIAL COURT COMMITTED PLAIN ERROR BY DISCONTINUING A VOLUNTARY MANSLAUGHTER INSTRUCTION TO THE JURY, OVER PROSECUTORIAL OBJECTION, IN VIOLATION OF PETITIONER'S DUE PROCESS RIGHTS, OR DEFENSE COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR FAILING TO REQUEST AND/OR OBJECT TO THE COURT'S DISCONTINUATION [OF THE INSTRUCTION REGARDING] VOLUNTARY MANSLAUGHTER.

III.    THE DEFENDANT WAS DENIED DUE PROCESS OF LAW ON HIS APPEAL OF RIGHT [AND] HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL [WHEN COUNSEL FAILED TO RAISE] MERITORIOUS AND STRONGER CLAIMS OF ERROR ON APPEAL THAT WOULD HAVE REVERSED HIS CONVICTION(S).

(Amended Brief in Support of Motion for Relief from Judgment at i, docket # 62).

On January 11, 2008, Judge Leiber denied petitioner's amended motion for post-conviction relief.  (1/11/08 Order, docket # 64).  He rejected petitioner's claims of ineffective assistance of appellate counsel.  (*Id.* at 2).  It was petitioner's burden to show that counsel's performance fell below an objective standard of reasonableness according to prevailing professional norms and prejudice by showing that there was a reasonable probability that but for counsel's errors the outcome would have been different.  (*Id.*).  Judge Leiber determined that petitioner had not satisfied this high burden.  Among other things, he noted: "Contrary to defendant's assertions, appellate counsel's failure to raise every conceivable issue does not constitute ineffective assistance

of counsel.  Furthermore, it is presumed that appellate counsel's decisions regarding which claims

to pursue constitute sound appellate strategy."  (*Id.*).

Judge Leiber rejected all petitioner's claims related to jury instructions:

Defendant contends the Court erred when it failed to give an instruction on voluntary manslaughter.  Defendant's contention is without merit.  Defendant claimed the incident in question was an accident.  A court is not required to give a defendant's requested instruction when it is not supported by the evidence.  *People v Rodriguez*, 463 Mich 466, 472-473; 620 NW2d 113 (2000).  There was no evidence to support the contention that Defendant killed in the heat of passion, that the passion was caused by adequate provocation and that there was not a lapse of time during which a reasonable person could have controlled his passion.  *See People v Sullivan*, 231 Mich App 510, 518; 586 NW2d 578 (1990).  Therefore it was not error when the Court failed to give the requested voluntary manslaughter instruction.

(Op., 2).

Judge Leiber rejected all petitioner's claims based on his evidentiary rulings:

Defendant argues that the Court erred when it excluded testimony concerning the reference to a gun because if it had been allowed it would have supported his claim that he saw someone produce a gun before this incident occurred.  The testimony at issue pertains to (1) proposed testimony from a police officer that some people told him that after Defendant had left the scene that someone saw someone else with a gun, and (2) testimony from a witness that he saw someone with a gun after Defendant had left the scene.  While Defendant raises an interesting argument, it is unlikely that the jury would have acquitted the Defendant if it had heard at some point after Defendant had left the scene someone produced a gun.

(Op., 3).

Petitioner sought leave to appeal in Michigan's appellate courts, which was denied

in standard orders entered by the Michigan Court of Appeals on April 17, 2008 (4/17/08 Order,

found in Michigan Court of Appeals record, docket # 60) and the Michigan Supreme Court on

October 27, 2008 (10/27/08 Order, found in Michigan Supreme Court record, docket # 61).

F.   **Reopening and Amendment of Habeas Corpus Petition**

On November 24, 2008, petitioner returned to this court and filed a motion seeking leave to amend his petition to add the grounds Judge Leiber had rejected.  (Motion, docket # 33). On November 24, 2008, the court directed the Clerk to reopen the case and ordered petitioner to file an amended petition.  (docket # 35).  On December 15, 2008, petitioner filed his amended petition. (docket # 36).  The same day, the court entered an order directing respondent to file an answer or other pleading in response to the amended habeas corpus petition.  (docket # 37).  In July 2009, respondent filed an answer and the accompanying Rule 5 materials.  (docket # 40).  In June 2013, the court ordered respondent to supplement the Rule 5 materials, and respondent complied with the court's order.  (docket #s 69-72).

**Discussion**

I.   **Evidentiary Rulings**

In ground I, petitioner argues:  "The trial court abused its discretion when it granted the prosecutor's motion [in limine regarding Kack's testimony] over defense objection, to exclude testimonial evidence of a gun(s) at the scene of the crime for which [] petitioner was charged [.]" He argues that the court's evidentiary ruling "not only violated petitioner's Sixth and Fourteenth Amendment rights to confront and cross-examine witnesses to establish and corroborate his defense to the charges, but also denied petitioner a fair trial, or defense counsel was ineffective under the Sixth Amendment for which the testimonial evidence of a gun(s) was excluded by the trial court." (docket # 36 at 6, ID# 250; docket # 36-7 at 8, ID# 266).

-33-

A.     Abuse of Discretion Under Michigan Law

Petitioner argues that Judge Leiber committed error under Michigan law and abused his discretion when he made his evidentiary rulings concerning the possible presence of a gun at the scene after petitioner drove away.  (Pet. Brief at 17-25).  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction" because "it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.

B.     Due Process

Petitioner's argument fares no better when it is recast as an argument that the court's evidentiary rulings deprived him of a "fair trial" in violation of his rights under the Due Process Clause.  State-court evidentiary rulings cannot rise to the level of due process violations unless they "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Engelhoff*, 518 U.S. 37, 43 (1996)); *accord Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."  *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983); *see Wilson v. Parker*, 515 F.3d 682, 705 (6th Cir. 2008).  This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

-34-

Further, under the AEDPA, the court may not grant relief solely because it would have decided the evidentiary question differently. The court may only grant relief if petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner has not met this difficult standard. The Supreme Court has never indicated that exclusion of such tangential and marginally relevant evidence offends due process.

### C.    Confrontation Clause/Right to Present a Defense

Petitioner argues that the trial court's evidentiary rulings violated his right to present a defense and his rights under the Confrontation Clause. (Pet. Brief at 16-25). Specifically, he argues that the court's rulings "prohibit[ed] cross-examination [of Kack which] excluded evidence essential to the [p]etitioner's defense" and prevented him "from asserting multiple defense[s]." (*Id.* at 21-25). Further, he argues that the trial court should have allowed into evidence the statements of unknown declarants noted in police reports. (*Id.*).

The Sixth Amendment's Confrontation Clause states that in all criminal prosecutions, the accused shall enjoy the right "to be confronted with the witnesses against him." U.S. Const. Am. VI. The Confrontation Clause is applicable to the States through the Fourteenth Amendment's Due Process Clause. *See Pointer v. Texas*, 380 U.S. 400, 403 (1965). The Supreme Court's "Confrontation Clause cases fall in two broad categories: cases involving the admission of out-of-court statements and cases involving restrictions imposed by law or the trial court on the scope of cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 18 (1985) (*per curiam*). Petitioner's

challenge to the trial court's ruling regarding police reports attributing statements to unknown declarants falls within the first category. The first category reflects the Court's longstanding recognition that the literal right to confront the witness at the time of trial forms the core of the values furthered by the Confrontation Clause.[8] *Id.* (citations omitted). Petitioner's challenge to the evidentiary ruling regarding Kack's preliminary examination testimony (before any witness testified at trial)[9] arguably falls within the second category.

Cross-examination is a "primary interest" secured by the Confrontation Clause. *Douglas v. Alabama*, 380 U.S. 415, 418 (1965). "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination in whatever way, and to whatever extent, the defense might wish." *Fensterer*, 474 U.S. at 20. The Confrontation Clause of the Sixth Amendment does not prevent a trial judge from imposing any limits on defense counsel's cross-examination. "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limitations on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986); *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

---

[8]There was obviously no Confrontation Clause violation stemming from the trial court's exclusion of purported statements made by unknown declarants. The unknown declarants never testified at petitioner's trial. Thus, petitioner was not deprived of the opportunity to "confront" such witnesses.

[9]Judge Leiber noted the lack of a nexus between the crimes charged and events taking place afterwards. (TT II, 170). A review of Kack's trial testimony reveals a single objection to the form of a question, which petitioner's attorney corrected before it became necessary for the court to make any ruling. (TT III, 277). The trial court judge did not make any ruling during Kack's testimony restricting the scope of cross-examination.

The Supreme Court has recognized a criminal defendant's right to present a defense. "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).  This latitude, however, has limits. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted).  This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are " 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"  *United States v. Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).  "While the Constitution thus prohibits exclusion of defense evidence under rules that serve no legitimate purpose or that they are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of issues, or potential  to mislead the jury." *Holmes v. South Carolina*, 547 U.S. at 326. "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. at 308.

The decisions of the state courts regarding petitioner's claims of abridgement of his right to present a defense easily withstand scrutiny under deferential AEDPA standards.  The Michigan Court of Appeals found that the defense of accident that petitioner chose was the strongest defense available to him.  (Op., 2).  The trial court's evidentiary rulings did not prevent petitioner from asserting inconsistent and weaker defenses.  (*Id.*).  If petitioner had pursued the list of far

weaker defenses that he now endorses, he would have run the risk of undermining his best defense -- that he "struck the victims unintentionally as a result of his panicky flight from a potentially dangerous situation." (*Id.*).  The strategy of pursuing the best defense available worked.  It allowed petitioner to avoid a non-parolable life sentence for first-degree murder.

Petitioner's argument that the trial court's evidentiary rulings violated his rights under the Confrontation Clause is equally devoid of merit.  Petitioner's attorney conducted extensive cross-examination of Kack.  (TT III, 272-84).  The testimony from Kack foreclosed by the court's ruling (made before any witness had testified at trial) was not particularly significant.  Kack never saw a gun before petitioner ran over the pedestrians.  The strategic reasons for not recalling Kack as a witness after petitioner had testified and asking the court to revisit its earlier ruling in light of petitioner's testimony are readily apparent.  Petitioner was the last witness to testify.  He had been able to tell the jury his version of events and relate that he was "sorry" and "didn't mean for anybody to get hurt."  (TT IX, 884).  All three victims were Kack's friends.  Kong was a "very good" and "close" friend.  (TT III, 249-50, 254, 266, 275, 283).  If Kack had testified that he saw a gun after the event, it would not have added any significant support to petitioner's story that a large group of Laotian men had been coming after him and that he saw one of them pull out what appeared to be a gun.  Kack's testimony would have further reinforced the fact that petitioner was the only witness who claimed to have seen a gun-like object at any time before petitioner started running over people.  Kack's testimony would have done more to undermine petitioner's testimony than support it.

Further, any errors attributable to the trial court's rulings were harmless.  Harmless error analysis applies in this context.  *See Van Arsdall*, 475 U.S. at 681-84.  As the Supreme Court has "stressed on more than one occasion, the Constitution entitles a criminal defendant to a fair trial,

not a perfect one." *Id.* at 681. The *Brecht* harmless error standard applies on habeas corpus review. *See Fry v. Piller*, 551 U.S. 112, 121-22 (2007); *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). Under the *Brecht* standard, "an error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Fry*, 551 U.S. at 116 (quoting *Brecht*, 507 U.S. at 631). "In *Van Arsdall*, the Court mentioned a number of factors bearing on an assessment of harmlessness, including the importance of the testimony foreclosed, whether it was cumulative, the extent of cross-examination otherwise permitted, 'and, of course, the overall strength of the prosecution's case.'" *Farley v. Bissonnette*, 544 F.3d 344, 348 (1st Cir. 2008) (quoting *Van Arsdall*, 475 U.S. at 684). It was "unlikely" that petitioner's jury would have changed its verdict if it had heard that sometime after petitioner had left the scene someone produced a gun. (Order at 3). The evidence against petitioner was overwhelming. On this record, the jury could have easily found him guilty of first-degree murder rather than second-degree murder for killing Kong. Petitioner has not demonstrated that the state-court decisions rejecting his right to present a defense and Confrontation Clause claims were an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

## II.    Jury Instructions

In ground II, petitioner argues that the trial court erred by not *sua sponte* giving an instruction on voluntary manslaughter. (docket # 36 at 7, ID# 251; docket # 36-7 at 10-12, ID#s 268-70; *see* Pet. Brief at 30-36). In ground VII, he argues that improper jury instructions deprived him of a fair trial and that the Michigan Court of Appeals "improperly held" that the "omission of an instruction on gross negligence did not constitute plain error affecting substantial rights because the evidence overwhelmingly showed that [petitioner] deliberately drove his vehicle into a crowd of

people."  (docket # 36 at 10, ID# 254; docket # 36-7 at 18-19, ID#s 276-77; *see* Pet. Brief at 55-58)

(citing Op. at 3).  Petitioner cannot possibly overturn his convictions on the basis of these arguments.

First, by reason of AEDPA, 28 U.S.C. § 2254(d)(1), a habeas corpus petitioner must ground his

claim for relief on clearly established federal law as determined by the Supreme Court of the United

States.  *See Premo v. Moore*, 131 S. Ct. 733, 737 (2011).  Under this standard, the lower federal

courts must apply the "holdings" as opposed to the "dicta" of Supreme Court decisions as of the time

of the relevant state-court decision.  *Thaler v. Haynes*, 559 U.S. 43, 47 (2010) ("A legal principle

is 'clearly established' within the meaning [of section 2254(d)(1)] only when it is embodied within

the holding of this Court.").  Petitioner fails this test completely.  "[T]he Supreme Court has never

held that due process requires the giving of lesser- included offenses in noncapital cases."[10] *Dansby*

*v. Trombley*, 369 F. App'x 657, 660 (6th Cir. 2010); *see Scott v. Elo*, 302 F.3d 598, 606 (6th Cir.

2002); *accord Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (*en banc*); *Reyna v. Smith*, No.

1:13-cv-1081, 2013 WL 5806171, at * 3 (W.D. Mich. Oct. 29, 2013).  Petitioner's challenges to the

jury instructions and the appellate decision regarding the instructions therefore fail at the first step

of the analysis under AEDPA.

       Moreover, petitioner cannot show that the denial of a voluntary manslaughter

instruction was erroneous, let alone that it so infected the fairness of his trial as to violate due

process.  Typically, a claim that a trial court gave an improper jury instruction is not cognizable on

habeas review.  Instead, the petitioner must show that the erroneous instruction "so infected the

---

[10]In *Beck v. Alabama*, 447 U.S. 625 (1980), "the Supreme Court granted state criminal
defendants in capital murder cases a constitutional right to jury instructions on lesser-included
offenses, but it expressly reserved the question of 'whether the Due Process clause would require the
giving of such instructions in a noncapital case.'" *Dansby v. Trombley*, 369 F. App'x at 660 (quoting
*Beck*, 447 U.S. at 638 n.14).

entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145 (1977); *see also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same). In the instant case, the trial judge's failure to *sua sponte* instruct the jury as to voluntary manslaughter did not prejudice petitioner's due process rights.

Although the punishment for the crime of manslaughter is defined by statute, MICH. COMP. LAWS § 750.321, "it is the common law that defines the crime." *People v. Sullivan*, 586 N.W.2d 578, 582 (Mich. Ct. App. 1998). "The common law recognizes two forms of manslaughter: voluntary and involuntary." *People v. Mendoza*, 664 N.W.2d 685, 690 (Mich. 2003). "[B]oth forms of manslaughter are necessarily included lesser offenses of murder." *Id.* The elements of voluntary manslaughter are (1) the defendant must kill in the heat of passion, (2) the passion must be caused by an adequate provocation,[11] and (3) there cannot be a lapse of time during which a reasonable person could control his passions. *Sullivan*, 586 N.W.2d at 582 (citations omitted). "The element of provocation distinguishes the offense of manslaughter from murder. The provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason. Case law has consistently held that the provocation must be adequate,

---

[11]"Involuntary manslaughter is the unintentional killing of another, without malice, during the commission of an unlawful act not amounting to a felony and not naturally tending to cause great bodily harm; or during the commission of some lawful act, negligently performed; or in the negligent omission to perform a legal duty." *Mendoza*, 664 N.W.2d at 690. "In contrast to the case of voluntary manslaughter . . . the absence of malice in involuntary manslaughter arises not because of provocation produced passion, but rather because the offender's mental state is not sufficiently culpable to reach the traditional malice requirements." *Id.* at 692-93 (quoting *United States v. Browner*, 889 F.2d 549, 553 (5th Cir. 1989)).

namely, that it would cause a *reasonable person* to lose control." *Id.* (citing *People v. Townes*, 218 N.W.2d 136, 140-41 (Mich. 1974)).  Under Michigan law, if the evidence presented would support a conviction of a cognate lesser offense, "the trial court *if requested*, must instruct on it."  *People v. Sullivan*, 586 N.W.2d at 582.  In this instance, there was no request made for an instruction on voluntary manslaughter.  The parties stipulated to the instruction that the trial court gave on involuntary manslaughter.  (TT X, 1033-34).  Further, under Michigan law, the trial judge is only required to instruct the jury on voluntary manslaughter "if supported by a rational view of the evidence."  *Mendoza*, 664 N.W.2d at 693; *see Dansby v. Trombley*, 369 F. App'x at 660.  Judge Leiber held that petitioner was not entitled to a jury instruction on voluntary manslaughter because it was not supported by the evidence.  "There was no evidence to support the contention that Defendant killed in the heat of passion, that the passion was caused by adequate provocation and that there was not a lapse of time during which a reasonable person could have controlled his passion." (Order at 2-3) (citing *Sullivan*, 586 N.W.2d at 582).  The Michigan Court of Appeals held that the absence of an instruction on gross negligence did not deprive petitioner of a fair trial.  (Op. at 3). Petitioner has not demonstrated any error under state law, much less overcome the substantially higher hurdle he faces under AEDPA.  The state court decisions rejecting petitioner's arguments based on jury instructions easily withstand scrutiny under AEDPA.  28 U.S.C. § 2254(d)(1).

## III.    Ineffective Assistance Counsel

Petitioner makes a number of claims of ineffective assistance of counsel, all of which were rejected by the state courts.  In ground I, petitioner argues that his attorney was ineffective because he failed to persuade the trial court to admit "gun evidence."  (docket # 36 at 6, ID# 250; docket # 36-7 at 10, ID# 268; *see* Pet. Brief at 25-29).  In ground II, he argues that his attorney was

ineffective because he failed to request a voluntary manslaughter instruction and did not object when the judge stopped delivering the instruction. (docket # 36 at 7, ID# 251; docket # 36-7 at 12, ID# 270; *see* Pet. Brief at 33-37). In ground III, he claims ineffective assistance of appellate counsel for failure to raise the issues that he later raised in his unsuccessful motion for post-conviction relief under Rule 6.500 of the Michigan Court Rules. (docket # 36 at 8, ID# 252; docket # 36-7 at 12-13, ID#s 270-71; *see* Pet. Brief at 37-42). In ground IV, he argues that his trial attorney was ineffective because he did not request jury instructions on the defenses of "self-defense or defense of others." (docket # 36 at 10, ID# 254; docket # 36-7 at 13-15, ID#s 271-73; *see* Pet. Brief at 43-47). In ground V, petitioner argues that his trial attorney was ineffective because he did not object to the assistant prosecutor's use in cross-examination of the written correspondence between petitioner and Saruth. (docket # 36 at 10, ID# 254; docket # 36-7 at 15-17, ID#s 273-75; *see* Pet. Brief at 47-51).

A.    Standards

The Michigan courts decided all petitioner's Sixth Amendment claims on their merits, applying the federal standard adopted by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*,

350 U.S. 91, 101 (1955)).  On the prejudice prong, the court focuses on "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  "[T]he defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

Claims of ineffective assistance of appellate counsel are measured under the standards established by the Supreme Court in *Strickland*.  *See Evitts v. Lucey*, 469 U.S. 387 (1985).  In the case of appellate counsel, petitioner has no constitutional right to have every nonfrivolous issue raised on appeal.  *Jones v. Barnes*, 463 U.S. 745, 754 (1983).  Appellate counsel acts within the fair range of professional assistance when counsel chooses not to assert weak or unsupported issues on appeal.  *See Smith v. Murray*, 477 U.S. 527, 536 (1986).  Tactical choices regarding issues on appeal are properly left to the sound judgment of counsel.  *See United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  " 'Winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of appellate advocacy."  *Smith v. Murray*, 477 U.S. at 536 (quoting *Jones v. Barnes*, 463 U.S. at 751-52).  Where appellate counsel is charged with ineffectiveness for failure to raise a particular claim, "it is difficult to demonstrate that counsel was incompetent."  *Smith v. Robbins*, 528 U.S. 259, 288 (2000). To overcome the presumption of competence of appellate counsel in these circumstances, a petitioner must show that the omitted issues were "clearly stronger" than those counsel chose to assert.  *Id.*;  *see Bourne v. Curtin*, 666 F.3d 411, 414 (6th Cir. 2012) (Petitioner "must show the issues his appellate counsel failed to raise were 'clearly stronger' than the issues his counsel did raise – and that the state court lacked a reasonable basis for believing otherwise.").  Appellate counsel has no duty to raise meritless

issues.  *Evitts*, 469 U.S. at 394; *Lewis v. Alexander*, 11 F.3d 1349, 1354 (6th Cir. 1993).  As for prejudice, the court focuses on whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair," *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), and "[t]he defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  Consequently, counsel's failure to raise an issue on appeal is ineffective assistance "only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005).

Because the Michigan courts decided petitioner's claims of ineffective assistance of counsel on their merits, the decisions must be afforded deference under AEDPA.  *See Burt v. Titlow*, 134 S. Ct. 10, 15-16 (2013); *Harrington v. Richter*, 131 S. Ct. at 784.  To receive habeas relief, petitioner must demonstrate that the state courts' decisions were contrary to, or represented an unreasonable application of, *Strickland v. Washington*.  *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002).  Hence, it is not enough to convince the federal habeas court that, in its independent judgment, the state-court decisions applied *Strickland* incorrectly.  Rather, petitioner must show that the state courts "applied Strickland to the facts of his case in an objectively unreasonable manner." *Bell*, 535 U.S. at 699; *see Campbell v. Bradshaw*, 674 F.3d 578, 586-87 (6th Cir. 2012).  This creates a "high burden" for petitioner.  *See Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006); *see also Hodges v. Colson*, 727 F.3d 517, 534 (2013).  "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  Supreme Court decisions describe this as "the doubly deferential judicial review that applies to a *Strickland* claim

evaluated under the § 2254(d)(1) standard." *Knowles*, 556 U.S. at 123; *see Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*). The question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Premo v. Moore*, 131 S. Ct. 733, 740 (2011); *see Ballinger v. Prelesnik*, 709 F.3d 558, 563 (6th Cir. 2013).

      B.    <u>Trial Counsel</u>

      Petitioner argues that his trial counsel was constitutionally ineffective because he failed to persuade the trial court to admit "gun evidence," failed to request a voluntary manslaughter instruction,[12] did not object when the judge stopped delivering the instruction, did not request jury instructions on the defenses of self-defense or defense of others, and did not object to the assistant prosecutor's use in cross-examination of written correspondence between petitioner and Saruth. The Michigan courts rejected these arguments. Counsel's failure to make a frivolous or meritless motion or objection does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007). "Defendant's trial counsel elected to present a defense based on the theory that defendant struck the victims accidentally as a result of his panicky flight from a potentially dangerous situation." (Op. at 2). "The defenses defendant now claims should have been presented are not well supported by the evidence

---

    [12]"Even if there were a colorable claim that a voluntary manslaughter instruction was appropriate, there is no indication that [petitioner's] counsel acted outside the range of permissible trial strategies by opting not to request it." *Harrop v. Sheets*, 430 F. App'x 500, 506 (6th Cir. 2011). Counsel's decision to request jury instructions on lesser included offenses such as involuntary manslaughter made it clear that counsel was aware of his duty to request instructions on inferior offenses where appropriate, and counsel "could have decided not to request the voluntary manslaughter instruction because he thought it would be futile, or because it would have diluted the other arguments he was advancing to the jury." *Harrop*, 430 F. App'x at 507; *see Pierson v. Berghuis*, No. 1:10-cv-455, 2013 WL 4067619, at * 9 (W.D. Mich. Aug. 12, 2013).

presented in the record, and his trial counsel cannot be faulted for choosing the strongest of several defenses. Furthermore, defendant correctly notes that he could have presented inconsistent defenses, defendant has failed to overcome the strong presumption that his trial counsel's decision to present an accident defense alone was nothing more than sound trial strategy." (*Id.* at 2) (citation omitted). The Court of Appeals found no Fourth Amendment violation and that counsel was not ineffective in failing to advocate for the exclusion of evidence on Fourth Amendment grounds. (*Id.*). The state courts rejected all petitioner's claims of ineffective assistance of counsel related to jury instructions. (*Id.* at 1-2; Order at 2-3). The decisions of the state courts rejecting petitioner's claims of ineffective assistance of trial counsel easily withstand scrutiny under the doubly-deferential AEDPA standard of review.

C.    Appellate Counsel

Petitioner argues that his appellate counsel was constitutionally ineffective for his failure to raise the issues that plaintiff later raised in his motion for post-conviction relief. Judge Leiber rejected petitioner's arguments claiming violations of his rights under the Confrontation Clause, right to present a defense, right to jury instruction on voluntary manslaughter, and all the accompanying claims of ineffective assistance of trial counsel. Further, he found that petitioner's appellate counsel had not been ineffective when she decided not to raise these issues on appeal. (Order at 2-3). The issues petitioner raised in his motion for post-conviction relief were meritless, were not clearly stronger than the issues raised by appellate counsel, and there is not a reasonable probability that inclusion of those issues would have changed the result of the appeal. The decision of the state court rejecting petitioner's claim of ineffective assistance of appellate counsel easily withstands scrutiny under the doubly-deferential standard of review. The state-court decision

-47-

rejecting petitioner's claims of ineffective assistance of appellate counsel was not an unreasonable application of clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1).

## IV.    Fourth Amendment

In ground V, petitioner argues that his correspondence with Saruth had been seized in violation of his Fourth Amendment rights. (docket # 36 at 10, ID# 254; docket # 36-7 at 15-17, ID#s 273-75; *see* Pet. Brief at 47-51). The Michigan Court of Appeals held that no Fourth Amendment violation occurred. (Op. at 2). Habeas corpus review of this component of the state-court decision is barred by the doctrine of *Stone v. Powell*, 428 U.S. 465 (1976); *see also Good v. Berghuis*, 729 F. 3d 636, 637 (6th Cir. 2013). In *Stone v. Powell*, the Supreme Court held that federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence obtained through an unconstitutional search or seizure, as long as the state has given the petitioner a full and fair opportunity to litigate the Fourth Amendment claim. 428 U.S. at 494.

In order for the rule of *Stone v. Powell* to apply, the state must have provided, in the abstract, a mechanism by which to raise the Fourth Amendment claim, and the presentation of the claim in the case before the court must not have been frustrated by failure of that mechanism. *See Gilbert v. Parke*, 763 F.2d 821, 823 (6th Cir.1985). If these two inquiries are satisfied, federal habeas review of the Fourth Amendment claim is precluded, even if the federal court deems the state-court determination of the claim to have been in error. *Id.* at 824; *accord Jennings v. Rees*, 800 F.2d 72, 76 (6th Cir.1986); *Markham v. Smith*, 10 F. App'x 323, 326 (6th Cir. 2001).

In the present case, petitioner cannot satisfy either prong of the *Stone v. Powell* standard. First, it is beyond dispute that Michigan has a state procedural mechanism that presents

a defendant a full opportunity to raise a Fourth Amendment claim before trial.  Even before the

United States Supreme Court decided that the federal exclusionary rule applied to state criminal

proceedings, the Michigan courts applied the exclusionary rule to the fruits of unconstitutional

searches and seizures.  *See People v. Margelis*, 186 N.W. 488 (Mich.1922).  After *Mapp v. Ohio*,

367 U.S. 643 (1961), the Michigan courts consistently have acknowledged their duty, under both the

federal and state constitutions, to suppress evidence seized in violation of the Fourth Amendment.

*See, e.g., People v. David*, 326 N.W.2d 485, 488 (Mich. Ct. App. 1982). Consequently, Michigan

affords criminal defendants a vehicle by which to raise Fourth Amendment challenges.

Second, to satisfy the remaining prong of *Stone v. Powell*, petitioner must allege facts

showing that the state corrective mechanism has somehow broken down.  *See, e.g., Agee v. White*,

809 F.2d 1487, 1490 (11th Cir. 1987) (habeas review not barred when state appellate court

completely ignored Fourth Amendment claim).  The Sixth Circuit pointedly has held that the

doctrine of *Stone v. Powell* applies, even if the federal court deems the state-court determination of

the Fourth Amendment claim to have been in "egregious error."  *Gilbert v. Parke*, 763 F.2d at 824

(citing *Riley v. Gray*, 674 F.2d 522, 525-26 (6th Cir. 1982)).

Petitioner has not alleged any facts showing that the state's mechanism has broken

down.  Rather, it is clear that the Michigan courts gave petitioner's Fourth Amendment claim full

and proper consideration.  The Michigan Court of Appeals reviewed petitioner's claim on direct

appeal and concluded that his Fourth Amendment rights were not violated.  (Op. at 2).  Therefore,

even if this court were to disagree with the determination of the Michigan courts, that disagreement

would be insufficient to satisfy the second prong of the Sixth Circuit standard.  *Gilbert*, 763 F.2d at

824. Because petitioner has failed to demonstrate either prong of *Stone v. Powell*, his claim is barred on habeas review.

### V.  Impeachment

In ground VI, petitioner argues that the assistant prosecutor's cross-examination of petitioner constituted prosecutorial misconduct, which deprived him of a fair trial.  (docket # 36 at 10, ID# 254; docket # 36-7 at 17-18, ID#s 275-76; *see* Pet. Brief at 51-55).  In ground V, he objects to the assistant prosecutor's use in cross-examination of his correspondence with Saruth.  (docket # 36 at 10, ID# 254; docket # 36-7 at 15-17, ID#s 273-75; *see* Pet. Brief at 47-51, docket # 33-3, ID#s 145-49).

The scope of review in a habeas corpus action of prosecutorial misconduct is narrow. "Petitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).  This court does "not possess supervisory powers over state court trials." *Id.*  "It is the responsibility of the state courts to police their prosecutors; [this court has] no such authority." *Id.*  "Therefore, on habeas review, our standard is limited to 'the narrow one of due process.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (" '[T]he appropriate standard of review for ... a claim [of prosecutorial misconduct] on a [petition for a] writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.' ") (quoting *Darden*, 477 U.S. at 181).  To be grounds for habeas corpus relief, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181; *see Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012); *Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012).

Petitioner's argument that the assistant prosecutor violated a stipulation is meritless. Petitioner's direct examination testimony interjected the issue of his reasons for coming to Michigan when he claimed a purely economic motive. Nothing in the Constitution guaranteed petitioner the right to mislead the jury. The assistant prosecutor's questions merely established that petitioner's testimony had not been truthful and that he came to Michigan to "avoid trouble" in another state. Petitioner's jury never heard testimony regarding the nature of his "trouble," which apparently stemmed from his attempt to cut off a man's head. The questions posed by the assistant prosecutor were entirely appropriate, and resulted in no prejudice to petitioner. Further, petitioner's argument that the assistant prosecutor's use of correspondence during her cross-examination was improper is untenable, because the foundation of the argument is an assumption that the correspondence had been seized in violation of petitioner's Fourth Amendment rights.

Even assuming that petitioner's claims of prosecutorial misconduct conduct had substantive merit, there was no due-process violation. The evidence against petitioner was overwhelming. The assistant prosecutor's questions did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 132 S. Ct. at 2153. The decision of the Michigan Court of Appeals finding no due-process violation was not an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

## VI.    Sentencing

In ground VIII, petitioner challenges his life sentence on his second-degree murder conviction. He argues that Judge Leiber "improperly used" his alleged prior bad acts of rape, perjury, and attempting to cut off a man's head when he sentenced petitioner to life imprisonment. Petitioner argues that his life sentence is illegal, disproportionate, and was imposed in violation of

Michigan case law.[13]  (docket # 36 at 10, ID# 254; docket # 36-7 at 19-20, ID#s 277-78; *see* Pet.

Brief at 58-60).  Petitioner cites *Blakely v. Washington*, 542 U.S. 296 (2004), in support of the

following argument.

> [T]he arguments made by the prosecutor at sentencing, along with the above-noted commentary by a detective on the case, included information not proved beyond a reasonable doubt, and included evidence and information that encouraged the court to sentence petitioner to the highest possible sentence, life.
>
> The sentence was imposed regardless of the fact that the jury did not convict petitioner of first degree murder.  The defense maintains that even if this Honorable Court does not hold the above-noted violations to be an abuse of discretion by the sentencing judge, the sentence imposed in this case was disproportionate.

(Pet. Brief at 60).

Petitioner argues that his life sentence for second-degree murder violates the Eighth

Amendment's Cruel and Unusual Punishment Clause because it is disproportionate.  The United

States Constitution does not require strict proportionality between a crime and its punishment.

*Harmelin v. Michigan*, 501 U.S. 957, 965 (1991); *United States v. Marks*, 209 F.3d 577, 583 (6th

Cir. 2000).  "Consequently, only an extreme disparity between crime and sentence offends the Eighth

Amendment."  *Marks*, 209 F.3d at 583; *see also Lockyer v. Andrade*, 538 U.S. 63, 77 (2003) (gross

disproportionality principle applies only in the extraordinary case); *Ewing v. California*, 538 U.S.

11, 36 (2003) (principle applies only in " 'the rare case in which a threshold comparison of the crime

committed and the sentence imposed leads to an inference of gross disproportionality' ") (quoting

---

[13]Petitioner's argument that his life sentence violates a proportionality standard under *People v. Milbourn*, 461 N.W.2d 1 (Mich. 1990), is a pure issue of state law which does not provide a basis for federal habeas corpus relief.  *See* 28 U.S.C. § 2254(a); *see also Coogins v. Warren*, No. 13-11753, 2014 WL 1652202, at * 10 (E.D. Mich. Apr. 24, 2014) ("To the extent that petitioner relies on *People v. Milbourn*, 435 Mich. 630, 461 N.W.2d 1 (1990) her claim is solely one of state law which is not cognizable on federal habeas review."); *Gray v. Curtin*, No. 1:09-cv-959, 2013 WL 6327824, at * 8 (W.D. Mich. Dec. 5, 2013) (same).

*Harmelin*, 501 U.S. at 1005). A sentence that falls within the maximum penalty authorized by statute "generally does not constitute cruel and unusual punishment."[14] *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000); *see Hymes v. Birkett*, 526 F. App'x 515, 522 (6th Cir. 2013).

Petitioner is not facing the death penalty or a sentence of life imprisonment without the possibility of parole. The Supreme Court never has found an Eighth Amendment violation in a case such as this, where the trial court imposed a life sentence for an adult convicted of committing second-degree murder. Petitioner, therefore, cannot establish that his sentence violated clearly established Supreme Court precedent. *See Bunch v. Smith*, 685 F.3d 546, 553 (6th Cir. 2012) ("Since Bunch was not sentenced to 'life without parole,' his sentence does not violate clearly established federal law."). Moreover, petitioner's sentence was not disproportionate to his crime of second-degree murder. *See Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000); *see also King v. Rivard*, No. 5-11-cv-13621, 2014 WL 1118423, at *7 (E.D. Mich. Mar. 21, 2014); *Wilson v. Berghuis*, No. 1:08-cv-752, 2010 WL 4553648, at * 18 (W.D. Mich. Oct. 4, 2010).

Petitioner's Sixth Amendment challenge under *Blakely* is meritless for several reasons. The most fundamental reason is that the trial court judge did not rely on any of the petitioner's purported "bad acts" when he imposed sentence. Judge Leiber could not have expressed this point with greater clarity: " Let me make perfectly clear. You are being sentenced for the crime that you committed and for which the jury convicted you on May 1st. You are presumed innocent with regard to any and every other offense in any and every other jurisdiction." (ST, 16).

---

[14]Because petitioner was 23-years-old when he murdered Kong, his petition does not present the unique sentencing issues which arise in the criminal punishment of juvenile offenders. *See Miller v. Alabama*, 132 S. Ct. 2455 (2012); *Graham v. Florida*, 560 U.S. 48 (2010); *Roper v. Simmons*, 543 U.S. 551 (2005).

Petitioner's decision to "intentionally [drive] his car at a high rate of speed into a crowd of people without a care or concern who was hurt" was more than enough to support his life sentence for killing Kong.  (ST, 17-19).

Further, petitioner's reliance on the Supreme Court's *Blakely* decision is misplaced. The rule that the Supreme Court announced in *Blakely* does not apply to petitioner's case.[15]  In *Blakely*, the Supreme Court found that the Washington State determinate sentencing scheme, pursuant to which a defendant's maximum sentence could be enhanced by judicial fact-finding, violated the Sixth Amendment right to trial by jury.  The *Blakely* Court was careful to note, however, that indeterminate sentencing schemes do not run afoul of this principle.  542 U.S. at 308-09. Michigan has just such an indeterminate sentencing scheme.  The maximum sentence is not determined by the trial judge but is set by law.  *See People v. Drohan*, 715 N.W.2d 778, 789-90 (Mich. 2006).  Even assuming that the *Blakely* line of cases applies, no Sixth Amendment violation occurred, because the jury's verdict authorized the life sentence that petitioner received.  *See* MICH. COMP. LAWS § 750.317 (Second-degree murder "shall be punished by imprisonment in the state prison for life, or any term of years, in the discretion of the court trying the same."); *see also Fawaz v. Wolfenbarger*, No. 09-14965, 2013 WL 1395794, at * 13 (E.D. Mich. Apr. 5, 2013) ("Because

---

[15]The Supreme Court recently held that any fact that by law increases the mandatory minimum sentence is an element that must be submitted to the jury.  *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013).  The rule announced in *Alleyne* does not apply because no mandatory minimum sentence is at issue.  Further, the rule the Supreme Court announced in *Alleyne* does not apply retroactively to cases on collateral review.  *See Stockman v. Berghuis*, No. 2:10-cv-14860, 2013 WL 6885121, at * 14 (E.D. Mich. Dec. 31, 2013) (collecting cases); *Watson v. United States*, No. 1:12-cv-725, 2013 WL 6512974, at * 3 (W.D. Mich. Dec. 12, 2013).  In any event, the decision of the Michigan Court of Appeals upholding petitioner's sentence could not have been a violation of any clearly established Supreme Court precedent.  *See Kittka v. Franks*, 539 F. App'x 668, 673 (6th Cir. 2013).

petitioner's sentence fell within the statutorily-authorized maximum penalty of life imprisonment, which was not enhanced by judicial factfinding, no Sixth Amendment violation occurred."). Petitioner's challenges to his life sentence are devoid of merit.  He has not shown that the state court decisions imposing and upholding his life sentence for second-degree murder were unreasonable applications of clearly established Supreme Court precedent.  28 U.S.C. § 2254(d)(1).

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied on its merits.

Dated:  May 30, 2014         /s/  Joseph G. Scoville_____
                             United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).  General objections do not suffice.  *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).